**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **WILLIAM R. HARRIS, JR.,** | : | |
| **Plaintiff,** | : | **Case No. 2:04-cv-1051** |
| **v.** | : | **Judge Holschuh** |
| **CITY OF CIRCLEVILLE, et al.,** | : | **Magistrate Judge Kemp** |
| **Defendants.** | : | |
| | : | |

<u>**MEMORANDUM OPINION & ORDER**</u>

Plaintiff, William R. Harris, Jr., sustained a spinal cord injury while being booked at the

Circleville jail.  He filed suit against the City of Circleville and Circleville police officers Glenn

R. Williams, II, Robert Gaines, and Phillip Roar, seeking relief under 42 U.S.C. § 1983 for

alleged violations of his constitutional rights.  He also brought claims of assault and battery and

intentional infliction of emotional distress.  This matter is currently before the Court on

Plaintiff's motion for partial summary judgment on his claim that Defendants were deliberately

indifferent to his serious medical needs (Record at 96), and on Defendants' motion for summary

judgment on all claims (Record at 97).

**I.      Background and Procedural History**

On the evening of April 3, 2004, Harris, a 32-year-old African-American male, was

pulled over in his car by Ohio State Highway Patrol Trooper Heather McManes.  Trooper R.A.

Cooper arrived at the scene minutes later.  Harris was charged with speeding and OVI.  At the

time, the troopers also mistakenly believed that Harris had an outstanding arrest warrant for

failure to appear in the Reynoldsburg Mayor's Court.  Because Harris was largely uncooperative,

the troopers notified the Circleville Jail dispatch that they were bringing in a resistor.

At the jail, Circleville police officers Williams, Roar and Gaines took Harris, who was already handcuffed, directly to Cell 3, otherwise known as the "drunk tank."  In the cell, they initiated the booking process by attempting to remove Harris's jewelry and belt.  It is undisputed that Harris was uncooperative and pulled away from them.  According to Harris, when he refused to allow the officers to take his personal belongings, they kicked his leg out from under him and pushed him in the back, causing him to fall and hit his head inside the cell.  (Harris Dep. at 75; Harris Aff. ¶ 5, Ex. 2 to Pl.'s Mem. in Opp'n).

The officers then stood him up, and took him back out into the booking area so that their attempts to remove his personal property would be recorded on the surveillance videotape.  Officer Williams instructed Harris to kneel down.  Harris claims that he could not do so because he was handcuffed and one of the officers was pulling his arms up behind him.  When Harris did not  comply with the request to kneel, the officers engaged in a takedown maneuver to get Harris to the floor.  Officer Gaines pushed his knee into the back of Harris's knee and Officer Roar administered two peroneal strikes to the side of Harris's thigh.  Officer Roar fell to the floor with Harris, cushioning Harris's fall.

Harris testified that after he fell to the ground, he felt the officers' knees in his back.  The officers allegedly pulled his hands up, and placed a hand on his forehead.  Harris heard a popping noise and began to scream in pain.  He yelled that the officers had broken his neck and demanded that they stop shocking him.  He believed that they were using Tasers on him because "it felt like electricity was running through my body."  He told them that he could not move.  (Harris Dep. at 95).  The officers ignored his protests and, after removing his watch, necklace,

and belt, they told him to stand up.  When he again told them that he could not move, they dragged him back to Cell 3, stripped him down to his underwear and t-shirt and left him lying face-down on the cement floor.  That was at 10:18 p.m.

Harris continued to scream in pain and complain that his back was broken.  He testified at his deposition that because he could not move and was having trouble breathing, he thought he was going to die.  (Id. at 98).  He heard people walking past the cell, but no one responded to his cries for help.  Harris testified that one of the officers later came into the cell, kicked him in the ribs, and said, "Looks like we got us a broke nigger here."  The officer then turned around and left.  (Id.).

Finally, Patricia Rice, a jail employee, asked Corporal Stephanie Kinser to check on Harris, noting that he had not moved since being placed in the cell.  Harris told Kinser that his back was broken and that he needed to see a doctor.  Kinser called Sergeant Donald Barton and asked him to come to the jail regarding a "medical request."  When Barton arrived at the jail and examined Harris, he directed the dispatcher to call for an ambulance.  By then, it was 11:39 p.m., an hour and 20 minutes after the injury to his back occurred.

Harris was transported to Berger Hospital and then to Grant Medical Center where it was discovered, for the first time, that he suffered from a congenital condition called spinal stenosis, a narrowing of the spinal canal.  Because of this condition, he suffered a spinal cord injury during the takedown maneuver.  He underwent surgery three days later to relieve the pressure on his spinal cord.  The doctors fused several cervical disks with screws and plates.  While Harris has regained much of the feeling in his arms and legs and can walk with a cane, he still suffers numerous permanent effects of the spinal cord injury, including constant pain, weakness,

3

migraine headaches, sexual dysfunction, and loss of bowel and bladder control.  (Id. at 142-61).

Harris filed suit against the City of Circleville, and Circleville police officers Williams, Roar, and Gaines.  Count I of the Third Amended Complaint asserts § 1983 claims against Williams, Roar and Gaines.  Plaintiff alleges that they violated his constitutional rights by using excessive force against him and by exhibiting deliberate indifference to his serious medical needs.  Count II alleges that the City of Circleville's failure to train and supervise the officers caused these constitutional injuries.  Count III alleges a violation of the Equal Protection Clause of the Fourteenth Amendment.  Count IV asserts a claim of assault and battery, and Count V alleges intentional infliction of emotional distress.[1]

Harris has moved for partial summary judgment on his § 1983 claim of deliberate indifference to serious medical needs.  Defendants have moved for summary judgment on all claims asserted against them.

## II.    Standard of Review

Although summary judgment should be cautiously invoked, it is an integral part of the Federal Rules, which are designed "to secure the just, speedy and inexpensive determination of every action."  Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1). The standard for summary judgment is found in Federal Rule of Civil Procedure 56(c):

> [Summary judgment] . . . should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine

---

[1]  Plaintiff's original complaint also asserted claims against Circleville Emergency Medical Services and its employees Lisa Swift and D. Sharp, and against Kenneth Morckel, Director of the Ohio Department of Highway Safety, and State Troopers McManes and Cooper. All claims against these parties have been dismissed.

> issue as to any material fact and that the movant is
> entitled to judgment as a matter of law.

Summary judgment will be granted "only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is . . . [and where] no genuine issue remains for trial, . . . [for] the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try." Poller v. Columbia Broadcasting Sys., 368 U.S. 464, 467 (1962) (quoting Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 627 (1944)).  See also Lansing Dairy, Inc. v. Espy, 39 F.3d 1339, 1347 (6th Cir. 1994).

Moreover, the purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried.  Lashlee v. Sumner, 570 F.2d 107, 111 (6th Cir. 1978).  The court's duty is to determine only whether sufficient evidence has been presented to make the issue of fact a proper question for the jury; it does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Weaver v. Shadoan, 340 F.3d 398, 405 (6th Cir. 2003).

In a motion for summary judgment, the moving party bears the initial burden of showing that no genuine issue as to any material fact exists and that it is entitled to a judgment as a matter of law.  Leary v. Daeschner, 349 F.3d 888, 897 (6th Cir. 2003).  All the evidence and facts, as well as inferences to be drawn from the underlying facts, must be considered in the light most favorable to the party opposing the motion.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986);  Wade v. Knoxville Util. Bd., 259 F.3d 452, 460 (6th Cir. 2001). Additionally, any "unexplained gaps" in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157-60 (1970).

"[T]he mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." <u>Anderson</u>, 477 U.S. at 247-48 (emphasis in original). A "material" fact is one that "would have [the] effect of establishing or refuting one of [the] essential elements of a cause of action or defense asserted by the parties, and would necessarily affect [the] application of [an] appropriate principle of law to the rights and obligations of the parties." <u>Kendall v. Hoover Co.</u>, 751 F.2d 171, 174 (6th Cir. 1984). <u>See also</u> <u>Anderson</u>, 477 U.S. at 248. An issue of material fact is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248. <u>See also</u> <u>Leary</u>, 349 F.3d at 897.

If the moving party meets its burden, and adequate time for discovery has been provided, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. <u>Celotex</u>, 477 U.S. at 322. The nonmoving party must demonstrate that "there is a genuine issue for trial," and "cannot rest on her pleadings." <u>Hall v. Tollett</u>, 128 F.3d 418, 422 (6th Cir. 1997).

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must -- by affidavits or as otherwise provided in this rule -- set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

Fed. R. Civ. P. 56(e).

The existence of a mere scintilla of evidence in support of the opposing party's position

is insufficient; there must be evidence on which the jury could reasonably find for the opposing party. Anderson, 477 U.S. at 252. The nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." Moore v. Phillip Morris Companies, Inc., 8 F.3d 335, 340 (6th Cir. 1993). The court may, however, enter summary judgment if it concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the presented evidence. Anderson, 477 U.S. at 251-52; Lansing Dairy, Inc., 39 F.3d at 1347.

**III.     Discussion**

    **A.     Count I (§ 1983 Claims Against Williams, Roar, and Gaines)**

In Count I of the Third Amended Complaint, Plaintiff seeks relief under 42 U.S.C. § 1983 against Officers Williams, Roar, and Gaines. That statute states in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

42 U.S.C. § 1983. This statute "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" Graham v. Connor, 490 U.S. 386, 393-94 (1989) (quoting Baker v. McCollan, 443 U.S. 137, 144 n. 3 (1979)).

In order to recover under § 1983, a plaintiff must prove that the defendant, while acting under color of state law, violated rights secured by the Constitution or laws of the United States. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 150 (1970). In this case, it is undisputed that the Circleville police officers were acting under color of state law. Plaintiff claims that they

7

violated his constitutional rights by using excessive force against him, and by acting with deliberate indifference to his serious medical needs.  The Court turns first to Defendants' motion for summary judgment on the excessive force claim.

### 1.    Excessive Use of Force

#### a.    Fourth Amendment Applies

The parties disagree over whether the excessive force claim is governed by the Fourth Amendment's "objective reasonableness" standard or by the Fourteenth Amendment's more stringent "shocks the conscience" standard.  In <u>Phelps v. Coy</u>, 286 F.3d 295 (6th Cir. 2002), the Sixth Circuit explained that "[w]hich amendment applies depends on the status of the plaintiff at the time of the incident, whether free citizen, convicted prisoner, or something in between."  <u>Id.</u> at 299.  If the use of force occurs during the course of an arrest, the Fourth Amendment applies. If the use of force occurs post-conviction, the Eighth Amendment applies.  However, "if the plaintiff is not in a situation where his rights are governed by the particular provisions of the Fourth or Eighth Amendments, the more generally applicable due process clause of the Fourteenth Amendment still provides the individual some protection against physical abuse by officials."  <u>Id.</u> at 299-300.  Pretrial detainees generally fall into this last category.  <u>Id.</u> at 300.

Unfortunately, the dividing line between where the protections of the Fourth Amendment end and the protections of the Fourteenth Amendment begin is not well-defined.  In <u>Graham v. Connor</u>, 490 U.S. 386, 395 n.10 (1989), the Supreme Court noted that it has not yet "resolved the question whether the Fourth Amendment continues to provide individuals with protection against the deliberate use of excessive physical force beyond the point at which arrest ends and pretrial detention begins."  <u>See also</u> <u>Berishaj v. City of Warren</u>, Nos. 04-70998, 05-71476, 2006

WL 2069440, at *14 (E.D. Mich. July 26, 2006) ("It is not clear whether the Fourth Amendment continues to apply after arresting officers turn an arrestee over to colleagues for processing at the jail and excessive force is allegedly used during the latter period of custody.").

The Sixth Circuit has held that the Fourth Amendment's protections extend "throughout the time the person remains in the custody of the arresting officers." McDowell v. Rogers, 863 F.2d 1302, 1306 (6th Cir. 1988). The parties agree that this is the governing law, but disagree as to its application in this particular case. The question is whether, at the time the Circleville police officers used force against Plaintiff, he was in the joint custody of the arresting officers, Ohio State Highway Patrol Troopers McManes and Cooper, and the Circleville police officers who were booking Plaintiff at the troopers' request.

McManes testified that Circleville police officers were waiting for her arrival in the sally port at the Circleville Police Department, and that it was her intent to transfer custody of Harris to the Circleville Police Department and the jail. (McManes Dep. at 30). Both McManes and Cooper testified that, once inside the jail, the Circleville police officers took physical custody of Plaintiff. (McManes Dep. at 36; Cooper Dep. at 36). The jail surveillance video confirms this. (Ex. 1 to Pl.'s Mot. Partial Summ. J.). The Circleville officers immediately took Plaintiff to the "drunk tank" and initiated the booking process by attempting to remove Plaintiff's jewelry and belt. When he failed to cooperate, they took him back out to the booking area so that their attempts to remove his personal property would be videotaped. When he failed to comply with their instructions to get on his knees, they engaged in a takedown maneuver, removed his personal property and then returned him to his cell. Although McManes and Cooper were present and observed the entire incident, they had no physical contact with Plaintiff and were not

9

involved in the use of force.

However, this does not necessarily mean that Plaintiff was not in the joint custody of the arresting officers and the booking officers.  Throughout the entire incident, he was physically restrained by handcuffs placed on him by the State Highway Troopers.  After the Circleville officers dragged Plaintiff back to his cell, McManes and Cooper remained at the Circleville Jail for over an hour to complete paperwork incident to the arrest (McManes Dep. at 96-98; Cooper Dep. at 72) and, presumably, to obtain the handcuffs they used to restrain their prisoner.  In the jail surveillance video, Trooper McManes is observed, at some point after Plaintiff is injured, kneeling outside his cell door, reading the BMV's administrative license suspension form to him. The jail surveillance video shows that McManes remained at the jail until the paramedics arrived at 11:39 p.m. to take Plaintiff to the hospital.

In this Court's view, Plaintiff's claim is governed by the Fourth Amendment.  It is undisputed that Plaintiff was injured at the very beginning of the booking process, in the presence of the arresting officers.  A similar case from the Eastern District of Michigan is instructive.  In Guzinski v. Hasselbach, 920 F. Supp. 2d 762 (E.D. Mich. 1996), the district court extended the Fourth Amendment's protections through the end of the booking process.  The plaintiff in that case was arrested for DUI, taken to the county jail and placed in a holding cell. After being escorted to the booking window to begin the booking process, he indicated that he needed to use the bathroom.  When the booking officer ignored his request, plaintiff turned away and began walking toward the bathroom.  Twice, he was ordered to return to the booking window.  When he failed to comply with those orders, he was restrained by several officers including the officer who had arrested him.  The arresting officer allegedly injured the plaintiff's

arm in the process.

The court noted that the alleged excessive use of force took place "after arrest but before booking." Id. at 765. In determining whether to apply the Fourth or Fourteenth Amendment to plaintiff's claim, the court noted, "[w]hile I find no case in which the Sixth Circuit has addressed this issue, other courts and strong policy arguments would extend Fourth Amendment protections after arrest until a judicial officer has made a determination on probable cause and the issue of pre-trial release or detention." Id.[2] At the very least, "courts have treated the completion of the booking process as the point where 'arrest' ends and 'detention' begins." Id. at 766. The court decided that the Fourth Amendment applied to the plaintiff's claim because even though he had been turned over to the jailers, he had not yet been booked. The court believed that, during this time, plaintiff was in the "joint custody" of the booking officers and the arresting officer. Id.

This Court agrees with the reasoning set forth in Guzinski. The protections of the Fourth Amendment should be extended to cover all claims of excessive force that arise through the time the booking process is completed. The arresting officer has an obvious interest in remaining with the prisoner until the booking process has been correctly completed, at which time the jail assumes sole custody of the prisoner. Until then, the arrestee remains in the joint custody of the

----

[2] For example, in Pierce v. Multnomah County, 76 F.3d 1032, 1043 (9th Cir. 1996), the Ninth Circuit concluded that when an arrestee is detained without a warrant, the Fourth Amendment applies "up until the time such arrestee is released or found to be legally in custody based upon probable cause for arrest." See also Hill v. Algor, 85 F. Supp. 2d 391, 404 (D.N.J. 2000) (holding that because officers' use of force occurred in a holding cell before the plaintiff was "formally charged or taken before a judicial officer," the Fourth Amendment's "objective reasonableness" standard applied). These holdings comport with the Supreme Court's decision in Bell v. Wolfish, 441 U.S. 520, 523 (1979), defining "pretrial detainees" as those persons "who have been charged with a crime but who have not yet been tried on the charge."

arresting officer and the booking officers.  Therefore, even though the jail officers may find it necessary to take physical control of the arresting officer's prisoner in order to complete the booking process, the Fourth Amendment protection follows the prisoner throughout the arrest and the contiguous booking process.

Although it could be argued that Guzinski is distinguishable because the alleged injury in that case was caused by the arresting officer, other courts within the Sixth Circuit have applied the Fourth Amendment to claims that, during the booking process, a booking officer used excessive force.  See e.g., Bucherl v. Miller, No. 1:04cv7353, 2006 WL 2850460 (N.D. Ohio Oct. 2, 2006); Boyer v. City of Mansfield, 3 F. Supp. 2d 843 (N.D. Ohio 1998).

Having determined that the Fourth Amendment governs Plaintiff's claim of excessive force, the Court must next determine the proper scope of Plaintiff's claim.

### b.    Scope of Claim

In his Third Amended Complaint, Plaintiff alleges that the officers engaged in an excessive use of force when they struck at the back of his knee and administered peroneal strikes to force him to the floor, causing a compression injury to his spinal cord.  (Third Amd. Compl. at ¶¶ 10-11).  However, in his memorandum in opposition to Defendants' motion for summary judgment, Plaintiff also claims that the officers engaged in excessive force: (1) when one of the officers kicked his leg out from under him and pushed him in the back, causing him to land on the left side of his head inside the cell immediately upon his arrival at the jail (Harris Dep. at 75; Harris Aff. ¶ 5); and (2) when one of the officers kicked him in the ribs as he was lying paralyzed on the cell floor (Harris Dep. at 98).

Defendants argue that because Plaintiff failed to advance these additional claims of excessive force in his Third Amended Complaint, he is barred from pursuing them now. Defendants cite no authority for this proposition.  Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."  A plaintiff is not required to detail the facts upon which he bases his claim.  Rather, the scope of the claim is uncovered during the discovery process.  Conley v. Gibson, 355 U.S. 41, 47 (1957).

Plaintiff's complaint clearly sets forth a claim for excessive use of force, and paragraph 14 states, "[a]s a direct a proximate result of being taken to the floor by the defendant officers *and other force applied by the defendant officers*, plaintiff suffered bodily injury."  (Third Amd. Compl. ¶ 14).  This put Defendants on notice that the force at issue was not necessarily limited to what occurred during the takedown maneuver in the booking area.  Moreover, Plaintiff testified at length at his May 2006 deposition about the additional alleged uses of force.  Under these circumstances, Defendants cannot show any prejudice.  The Court therefore finds that Plaintiff may pursue his expanded excessive force claims.  See 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1219 (3d ed. 2004) (noting that plaintiff may augment original legal theory absent a showing of prejudice to the other party).

### c.    Analysis

In Graham v. Connor, the United States Supreme Court set forth the analysis to be used in determining whether a particular seizure is "reasonable" under the Fourth Amendment.  The Court stated, "the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and

circumstances confronting them, without regard to their underlying intent or motivation."  490

U.S. at 397.  Factors to be considered include "the severity of the crime at issue, whether the

suspect poses an immediate threat to the safety of the officers or others, and whether he is

actively resisting arrest or attempting to evade arrest by flight."  Id. at 396.  These factors,

however, are not exhaustive.  The ultimate question is "whether the totality of the circumstances

justifie[s] a particular sort of . . . seizure."  Id. (quoting Tennessee v. Garner, 471 U.S. 1, 8-9

(1985)).

     With respect to each of the alleged incidents of excessive use of force, Defendants argue

that they are entitled to summary judgment because, even viewing the facts in a light most

favorable to Plaintiff, their conduct was objectively reasonable in light of the facts and

circumstances confronting them.  Defendants have also asserted the defense of qualified

immunity.  "Qualified immunity is an affirmative defense that shields government officials 'from

liability for civil damages insofar as their conduct does not violate clearly established statutory

or constitutional rights of which a reasonable person would have known.' "  Estate of Carter v.

City of Detroit, 408 F.3d 305, 310 (6th Cir. 2005) (quoting Harlow v. Fitzgerald, 457 U.S. 800,

818, (1982)).  Once a defendant raises the defense of qualified immunity, the plaintiff bears the

burden of proving that the defendant is not entitled to qualified immunity.  Silberstein v. City of

Dayton, 440 F.3d 306, 311 (6th Cir. 2006).

     As the Supreme Court explained in Saucier v. Katz, 533 U.S. 194 (2001), a claim of

qualified immunity involves a two-step inquiry.  First, the court must determine whether the

facts, viewed in the light most favorable to the plaintiff, show that a constitutional violation has

occurred.  Id. at 201.  Second, the court must determine whether the constitutional right was

clearly established.  The relevant inquiry is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Id. at 201-02.  If there is no constitutional violation, or if the "law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate."  Id.

With these general principles in mind, the Court then turns to an analysis of each segment of Plaintiff's excessive force claim.  See Dickerson v. McClellan, 101 F.3d 1151, 1161 (6th Cir. 1996) (holding that excessive force claims are to be analyzed in segments).

**i)      Initial Incident in Cell**

Plaintiff alleges that the first incident of excessive force occurred inside the cell when the officers initially attempted to take his jewelry.  According to Plaintiff, Officer Roar slid a ballpoint pen under the chain of Plaintiff's necklace and yanked on it.  When Plaintiff verbally protested and pulled away, either Officer Roar or Officer Gaines kicked Plaintiff's leg out from under him and pushed him in the back, causing him to fall and hit the left side of his head. (Harris Dep. at 75; Harris Aff. ¶ 5).  Because Plaintiff was handcuffed, he was unable to break his fall.  Officers Roar and Gaines deny that they knocked Plaintiff to the ground inside the cell. (Roar Dep. at 36; Gaines Dep. at 66).  Officer Williams, however, testified that he believed that Plaintiff went to the floor, but could not recall with certainty.  (Williams Dep. at 39).  These conflicting accounts of what happened inside the cell preclude summary judgment on this portion of Plaintiff's excessive force claim.

If Plaintiff's account is to be believed, a jury could find that the officers' conduct was not objectively reasonable.  The Graham factors all cut in Plaintiff's favor.  He was accused of speeding, DUI and failing to appear in mayor's court, not particularly serious crimes.  It cannot

15

be said that he posed an immediate threat to the safety of the officers or others.  He was already

handcuffed and was inside a jail cell surrounded by several law enforcement officers.  Although

Plaintiff verbally protested and pulled away when the officers attempted to take his jewelry,

there is no evidence that he was violent or combative.  Under these circumstances, a reasonable

jury could find that the force used by the officers was excessive.  Moreover, it would have been

clear to a reasonable officer that such conduct was unlawful.  In McDowell, the Sixth Circuit

held that the need for application of force is nonexistent where a handcuffed arrestee is not trying

to escape or hurt anyone.  863 F.2d at 1307.  For these reasons, Defendants are not entitled to

qualified immunity on Plaintiff's first claim of excessive force.

### ii)       Takedown Maneuver in Booking Area

The facts giving rise to Plaintiff's second claim of excessive force are largely undisputed.

After Plaintiff refused to let the officers take his jewelry, the officers escorted him from inside

the cell back to the booking area so that their attempts to remove his personal property would be

recorded on videotape.  As seen on the jail surveillance videotape, Williams asked Plaintiff two

or three times in quick succession to kneel on the floor.  Plaintiff, however, remained standing.

He claims that he attempted to comply with Williams' request, but was unable to get on his

knees because Gaines was lifting Plaintiff's arms behind his back.

When Plaintiff failed to immediately comply with Williams' request, Gaines used his

knee to attempt to buckle the back of Plaintiff's knee.  When this attempt failed, Roar

administered two peroneal strikes to Plaintiff's thigh, causing Plaintiff to drop to the ground.

Plaintiff felt the officers kneeling on his back and pulling up on his arms.  One of the officers

16

placed a hand on Plaintiff's forehead.[3]  Plaintiff then heard a popping sound in his neck and began screaming that the officers had broken his back.  (Harris Dep. at 87-89).

Despite the unfortunate injury suffered by Plaintiff as a result of the takedown maneuver, Defendants nevertheless maintain that their conduct was objectively reasonable.  They note that Plaintiff was intoxicated, verbally abusive, and uncooperative.  Plaintiff's own use-of-force expert, Dr. Geoffrey Alpert, agreed that the officers' decision to take Plaintiff to the ground was appropriate because it facilitated control.  (Alpert Dep. at 42; Ex. L to Defs.' Mot. Summ. J.).  Plaintiff had not complied with Williams' request to kneel down and, according to Defendants, they needed to gain control of the situation so that they could complete the booking process.

Troopers McManes and Cooper, who witnessed the takedown maneuver, testified that the officers standing on either side of Plaintiff did not let him fall, but assisted him in going to the ground.  The troopers also testified that there was no reason to believe that the officers intended to injure Plaintiff.  (Cooper Dep. at 47; McManes Dep. at 50).  After viewing the videotape of the incident, Plaintiff's expert, Dr. Alpert, agreed.  (Alpert Dep. at 32).

Moreover, Dr. Alpert and Timothy Dimoff, Plaintiff's other use-of-force expert, both testified that there was no reason to anticipate that the specific techniques the officers used in the takedown maneuver would cause a spinal cord injury.  (Id. at 35; Dimoff Dep. at 69; Ex. M to Defs.' Mot. Summ. J.).  No one, including Plaintiff, knew that he suffered from spinal stenosis.  Patrick McCormick, M.D., testified that individuals with this condition can suffer serious injury simply by sneezing, bumping into a door, or tripping over a piece of furniture. (McCormick Dep.

---

[3]  Plaintiff claims that this officer also pulled up on his head.  (Harris Aff. ¶ 7).  However, when asked at his earlier deposition whether he specifically recalled someone pulling up on his head, he said that he did not.  (Harris Dep. at 89).

at 37, 46; Ex. J to Defs.' Mot. Summ. J.).

Plaintiff nevertheless argues that, based on the evidence presented, a reasonable jury could find that the officers' conduct was not objectively reasonable.  Applying the <u>Graham</u> factors, Plaintiff once again notes that he was not arrested for a serious crime, did not pose a threat to the safety of the officers or others, and did not actively resist arrest or attempt to flee. Because there was no need for urgent action, he argues that the officers' conduct was objectively unreasonable.

According to Plaintiff's expert witnesses, the officers failed to give Plaintiff ample time to comply with Williams' request to kneel before forcing him to the floor.  Alpert testified that "[i]f they gave him time to negotiate his way down to his knees, none of this probably would have happened."  (Alpert Dep. at 38).  Likewise, Dimoff concluded that "the action of giving him two quick commands and not giving him proper amount of time to react to those commands and then incorporating force downs [sic] strikes to – the combination of all those things that they did adds up to excessive force."  (Dimoff Dep. at 40).  Defendants have offered no expert testimony to the contrary.  Alpert concluded that the peroneal strikes were "unnecessary" and "unreasonable."  He believes that the officers should have used other techniques to get Plaintiff to the ground.  (Alpert Dep. at 62).  Officer Gaines testified that he could remember no other incident in which a handcuffed prisoner was taken to the ground inside the jail, and this was the only time he remembers a peroneal strike being administered to a handcuffed prisoner.  (Gaines Dep. at 134-35).

Plaintiff further notes that the officers' conduct violated the Circleville Jail Operations Manual.  According to the Manual, use-of-force guidelines are intended to be followed in

sequence so that a minimum amount of force will be used. (Ex. 3 to Pl.'s Mem. in Opp'n). When a prisoner refuses to comply with an order, the officer should first attempt verbal persuasion, then give a verbal warning. If the prisoner still fails to comply, additional personnel should be summoned. A control hold may be used, but the officers "will strike no blows unless the resisting prisoner becomes the attacker." If the prisoner becomes an attacker, the officer should summon aid, block the blows and, finally, engage in takedown techniques. (Id.). Plaintiff argues that since he was never an attacker, it was inappropriate and excessive for the officers to administer peroneal strikes. (Alpert Dep. at 41, 58, 62; Dimoff Dep. at 41-42). Peroneal strikes are aggressive pain-compliance techniques and not control holds. (Alpert Dep. at 33; Gaines Dep. at 92).

Defendants correctly point out that the alleged violation of the jail's use-of-force guidelines does not necessarily establish a constitutional violation. Nevertheless, the violation is certainly a factor to be considered in determining whether the officers' conduct was objectively reasonable. See, e.g., Gantt v. Akron Corrections Facility, No. 95-3147, 1996 WL 6530, at *2 (6th Cir. Jan. 8, 1996) (denial of summary judgment was proper where officers violated jail's policy regarding the use-of-force continuum); Gutierrez v. City of San Antonio, 139 F.3d 441, 449 (5th Cir.1998) ("it may be difficult to conclude that the officers acted reasonably if they performed an action that had been banned by their department.").

In the Court's view, based on the evidence presented, a reasonable jury could find that the force used during the takedown maneuver was excessive. After viewing the jail surveillance video and listening to the testimony of witnesses, a jury could reasonably find that the officers did not give Plaintiff ample time or opportunity to comply with their verbal commands prior to

engaging in the takedown maneuver, in which case their actions could be viewed as objectively unreasonable.  See Watkins v. Kanitz, No. 1:03-cv-428, 2004 WL 3457634, at *6 (W.D. Mich. Sept. 24, 2004) (denying summary judgment on claim of excessive force where plaintiff testified that the officer began hitting her without giving her any time to comply with another officer's command to exit her vehicle).

Even if Plaintiff was engaged in passive resistance, consciously refusing to obey Williams' order, the fact remains that he was already handcuffed and was under the firm control of three law enforcement officers.  Under these circumstances, a reasonable jury could find that it was not objectively reasonable for the officers to administer peroneal strikes.  See Bultema v. Benzie County, No. 04-1772, 2005 WL 1993429, at **8 (6th Cir. Aug. 17, 2005) (noting that "when a suspect has already been restrained, the officer's constitutional authority to use force is significantly more circumscribed.").

Having found that, viewing the evidence in a light most favorable to Plaintiff, a constitutional violation exists, the Court turns to the question of whether the law was clearly established.  In Lustig v. Mondeau, No. 05-1905, 2006 WL 3253496 (6th Cir. Nov. 8, 2006), the Sixth Circuit, reversing a grant of qualified immunity in an excessive force case, held that "it is sufficiently obvious under Graham that it would be objectively unreasonable for an officer to gratuitously cause additional pain to a nonviolent and, at most, passively resistant detainee while she is being restrained in a full control hold by two officers."  Id. at **7.  Because a reasonable officer would have known that the conduct alleged here was unlawful, qualified immunity is not available.

### iii)      Kicking in Ribs After Spinal Cord Injury

The final incident giving rise to Plaintiff's excessive use of force claim occurred after Plaintiff suffered the spinal cord injury and was lying paralyzed on the floor of his cell. According to Plaintiff, Officer Williams entered the cell and told him to get up.   When Plaintiff responded that he could not move, Williams allegedly said, "Yes, you can," and kicked him in the ribs.  Williams then said, "Looks like we got us a broke nigger here."  (Harris Dep. at 98).

Williams admits that he entered the cell, but claims that he was looking for a missing pair of handcuffs.  Because he thought that Plaintiff might be lying on top of them, he asked Plaintiff to roll over.  When Plaintiff told him that he could not move, Williams rolled him over, but found no handcuffs.  Williams denies kicking Plaintiff.  (Williams Dep. at 132-33).

These conflicting accounts of what happened clearly preclude summary judgment.  If Plaintiff's testimony is to be believed, there is no question that Williams engaged in an excessive use of force.  Under no circumstances is it objectively reasonable to kick an arrestee who is lying handcuffed and paralyzed on the floor of the cell.  Furthermore, no reasonable officer would have believed that such gratuitous violence would be constitutionally permissible.  See Gaddis ex rel. Gaddis v. Redford Twp., 364 F.3d 763, 772 (6th Cir. 2004) ("even minor uses of force are unconstitutionally excessive if they are 'totally gratuitous.'"); McDowell, 863 F.2d at 1307 (gratuitous blow to handcuffed suspect violates the Fourth Amendment).  Officer Williams, therefore, is not entitled to qualified immunity on this portion of Plaintiff's excessive force claim.

### 2.      Deliberate Indifference to Serious Medical Needs

Count I of Plaintiffs' Third Amended Complaint also alleges that "Defendants, acting

with deliberate indifference, failed to seek appropriate medical care for plaintiff in a timely manner and in accordance with established policy.  Defendants were aware that plaintiff had been harmed and/or that a substantial risk of serious harm to plaintiff existed, but failed to promptly summon or provide medical assistance.  As a result, plaintiff suffered extreme pain and emotional injury."  (Third Amd. Compl. ¶ 26).  Plaintiff and Defendants have filed cross-motions for summary judgment on this claim.  The Court finds that genuine issues of material fact preclude summary judgment in favor of either party.

The Fourteenth Amendment forbids prison officials from acting with "deliberate indifference" toward the serious medical needs of pretrial detainees.  See Blackmore v. Kalamazoo County, 390 F.3d 890, 895 (6th Cir. 2004) (citing Bell v. Wolfish, 441 U.S. 520, 545 (1979)).  In order to establish a constitutional violation, the plaintiff must prove an objective component and a subjective component.  Farmer v. Brennan, 511 U.S. 825, 834 (1994).

### a.    Objective Component

"The objective component requires the existence of a 'sufficiently serious' medical need."  Blackmore, 390 F.3d at 895 (quoting Farmer, 511 U.S. at 834).  The inmate must show that "he is incarcerated under conditions posing a substantial risk of serious harm."  Farmer, 511 U.S. at 834.  A medical need is objectively serious if it is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  Blackmore, 390 F.3d at 897 (quoting Gaudreault v. Municipality of Salem, 923 F.2d 203, 208 (1st Cir. 1990)).

Plaintiff argues that, with respect to the objective component, his spinal cord injury was so obvious that even a lay person would recognize the need for medical help.  The Court agrees.

Immediately following the takedown maneuver, Plaintiff began screaming in pain, complaining that he could not move his arms or legs, yelling that the officers broke his neck, and begging the officers to stop shocking him.  The officers had to help him sit up to take off his jewelry and belt, and then had to drag him back to his cell since he could not stand on his own.

Incredibly, Defendants argue that Plaintiff exhibited no obvious physical signs of injury because there was no bleeding, swelling or bruising, and Williams testified that he heard no "sounds of any kind of breakage," such as "crackling of the vertebrae."  Williams admitted that Plaintiff's complaints of a shocking sensation and the inability to move his arms and legs were indicative of a spinal cord injury, but noted that Plaintiff did not experience other symptoms of a spinal cord injury such as a spontaneous erection, loss of bowel control, or uncontrollable twitching.  (Williams Dep. at 108-09).[4]

In the Court's view, it would have been obvious to any layperson that Plaintiff needed prompt medical attention.  Even though there was no visible external injury, Plaintiff's inability to move his arms and legs, combined with his pleas to the officers to stop shocking him, clearly signaled a serious problem.  No reasonable jury could find otherwise.

Dr. McCormick stated in his report that dragging Plaintiff to his cell did not did not exacerbate the spinal cord injury, and the delay in obtaining medical treatment caused no additional harm.  (Ex. to McCormick Dep.).  Citing Napier v. Madison County, 238 F.3d 739

---

[4]  Williams' testimony appears to contradict a statement he made to a lieutenant within days of the incident.  Williams told the investigating officer that when he went back into Plaintiff's cell to look for the handcuffs, Plaintiff's "shoulders were flopping around" and "his hips was [sic] twitching."  (Williams Dep. at 153).  Corporal Kinser's incident report also indicates that, when she went in to check on Plaintiff she noticed that Plaintiff's legs were twitching. (Ex. 3 to Pl.'s Mot. Summ. J.).

(6th Cir. 2001), Defendants argue that because Plaintiff has presented no evidence that the delay in obtaining medical treatment had a detrimental effect, he cannot establish a constitutional violation.  As the Sixth Circuit noted in Blackmore, however, "Napier does not apply to medical care claims where facts show an obvious need for medical care that laymen would readily discern as requiring prompt medical attention by competent health care providers."  Blackmore, 390 F.3d at 898.  In cases involving obvious injury or illness, "it is sufficient to show that he actually experienced the need for medical treatment, and that the need was not addressed within a reasonable time frame."  Id. at 900.  Therefore, because Plaintiff's injury was obvious, there is no need for him to prove that the delay in obtaining medical treatment was detrimental.

Even though the Court finds no genuine issue of material fact concerning whether Plaintiff's injury satisfies the objective component of his claim, genuine issues of material fact preclude summary judgment with respect to the subjective component.

### b.    Subjective Component

The subjective component of this claim requires an inmate to show that prison officials have "a sufficiently culpable state of mind" in denying medical care.  Farmer, 511 U.S. at 834. The plaintiff must show that the officials were deliberately indifferent to his serious medical needs.  Id.  Deliberate indifference is shown when prison officials intentionally deny or delay access to medical care.  See Estelle v. Gamble, 429 U.S. 97, 104 (1976).  It "entails something more than mere negligence," but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Farmer, 511 U.S. at 835.  "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837.

Genuine issues of material fact preclude summary judgment on this issue.  Based on the evidence presented, a reasonable jury could find that the officers were deliberately indifferent to Plaintiffs' serious medical needs.  Officer Williams testified that he knew that Plaintiff's complaints of being unable to move his arms and legs, and complaints of a shocking sensation were possible signs of a spinal cord injury.  (Williams Dep. at 108-09).  Moreover, the jail policy provides that all persons involved in use of force incidents who complain of injuries will receive medical attention as soon as possible. (Ex. O to Defs.' Mot. Summ. J.).  Although Plaintiff was involved in a use of force incident and was complaining of injuries, Williams did nothing to help him.  (Williams Dep. at 137-38).

Officer Roar testified that he believed that Plaintiff needed medical assistance but Roar relied on Williams, as the officer in charge, to summon help.  Roar does not recall having any discussion with Williams about the need to call an ambulance or the shift sergeant.  (Roar Dep. at 66-69).  Likewise, Officer Gaines testified that he relied on Williams as the officer in charge. (Gaines Dep. at 132).  He testified that, in retrospect, based on Plaintiff's complaints, he should have encouraged Williams to call for medical assistance.  (Id. at 133-34).  When asked why he failed to do so, Gaines replied, "I don't know.  I can't answer that.  I don't know."  (Id. at 130). Based on this evidence, a reasonable jury could find that the officers were deliberately indifferent to Plaintiff's serious medical needs.

There is also evidence, however, from which a reasonable jury could find to the contrary. Williams and Roar both testified that they suspected that Plaintiff might be faking his injuries as prisoners often do.  (Williams Dep. at 109; Roar Dep. at 67).  Plaintiff was intoxicated and

generally uncooperative.  More importantly, because the takedown maneuver was relatively

smooth, it was difficult to believe that it could have resulted in a spinal cord injury as Plaintiff

was claiming.  No one knew that Plaintiff suffered from spinal stenosis.  Trooper McManes, who

witnessed the maneuver, testified that she had no reason to believe that Plaintiff was truly

injured.  "They just took him to the ground.  I didn't see how he could be injured."  (McManes

Dep. at 57).  Likewise, Officer Gaines testified that he was "shocked" and "amazed" when

Plaintiff all of a sudden dropped to the ground "like a rock" and then complained of a broken

neck.  (Gaines Dep. at 131).  According to Gaines, Plaintiff still had strength in his arms and his

body after the takedown maneuver, and was able assist Officer Williams in sitting himself up.

(Id. at 103).  In addition, according to Williams and Roar, Plaintiff did not ask any of the

Defendants to summon help.  (Williams Dep. at 130; Roar Dep. at 69).  Williams further testified

that if the need for medical care had been obvious, he would have called the squad even if

Plaintiff did not request medical assistance.  (Williams Dep. at 110-14).

Because a reasonable jury could find in favor of either Plaintiff or Defendants with

respect to the subjective component, summary judgment is not warranted on this claim.  Nor are

Defendants entitled to qualified immunity.  Viewing the evidence in a light most favorable to

Plaintiff, his constitutional rights were violated when Defendants failed to seek timely medical

assistance.[5]  Moreover, a pretrial detainee's right to medical treatment for a serious medical need

---

[5] Defendants contend that the hour and twenty minutes that elapsed before medical help
was summoned does not demonstrate deliberate indifference.  In support, they cite to Hubbard v.
Gross, No. 05-5088, 2006 WL 2787044 (6th Cir. Sept. 27, 2006), in which the Sixth Circuit held
that even if the plaintiff's broken hand constituted an obvious injury, no reasonable jury could
find that the two-hour delay in obtaining a splint was unreasonable.  In this Court's view,
Hubbard is easily distinguishable on its facts.  A spinal cord injury is clearly more serious than a
broken hand.  While a two-hour delay in obtaining treatment for a broken hand might be

was clearly established at the time this incident occurred.  See Fitzke v. Shappell, 468 F.2d 1072,

1076 (6th Cir. 1972).  A reasonable officer would have understood that he had an affirmative

duty to summon prompt medical help for Plaintiff.

     **B.**       **Count II (§ 1983 Claims Against City of Circleville)**

Plaintiff alleges in Count II of his Third Amended Complaint that the above violations of

his constitutional rights were caused by the City of Circleville's custom, practice and/or policy

of inadequate and improper training, supervision and discipline of its police officers.[6]  Plaintiff

argues that, in failing to adequately train its officers, the City acted with deliberate indifference

to the constitutional rights of its citizens.  (Third Amd. Compl. ¶¶ 33-34).

The City of Circleville has moved for summary judgment on this claim, which is

governed by Monell v. Department of Social Services, 436 U.S. 658 (1978).  While a

governmental entity may be considered a "person" for purposes of § 1983, it cannot be held

liable for the acts of its employees on a *respondeat superior* theory.  Id. at 691.  A governmental

entity may be held liable for constitutional violations only if those violations are the result of an

official policy or custom.  Id. at 694.  See also City of Canton v. Harris, 489 U.S. 378, 389

(1989) (official policy or custom must be the "moving force" behind the alleged constitutional

deprivation); Hafer v. Melo, 502 U.S. 21, 25 (1991) ("the entity's 'policy or custom' must have

_____

reasonable, it does not necessarily follow that a similar delay in the case of a spinal cord injury is
also reasonable.

    [6]  Because Plaintiff's memorandum in opposition to Defendants' motion for summary
judgment does not discuss failure to supervise or discipline, the Court presumes that Plaintiff is
proceeding only on his "failure to train" claim.

played a part in the violation of federal law").

An official policy or custom may be found, and municipal liability may attach, if "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers. . . can reasonably be said to have been deliberately indifferent to the need." City of Canton, 489 U.S. at 390. As the Sixth Circuit explained in Cherrington v. Skeeter, 344 F.3d 631, 646 (6th Cir. 2003):

> We have read City of Canton as recognizing at least two situations in which inadequate training could be found to be the result of deliberate indifference. "One is failure to provide adequate training in light of foreseeable consequences that could result from the lack of instruction," as would be the case, for example, if a municipality failed to instruct its officers in the use of deadly force. Brown v. Shaner, 172 F.3d 927, 931 (6th Cir.1999). "A second type of situation justifying a conclusion of deliberate indifference is where the city fails to act in response to repeated complaints of constitutional violations by its officers." Brown, 172 F.3d at 931.

Plaintiff presents no evidence that the City failed to act in response to any previous complaints of constitutional violations by Circleville police officers. Instead, Plaintiff argues that it was reasonably foreseeable that a failure to adequately train the officers concerning the proper use of force and provision of medical care for pretrial detainees would result in constitutional violations. In order to succeed under this theory, Plaintiff must prove the following: "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." Ellis v. Cleveland Muni. Sch. Dist., 455 F.3d 690, 700 (6th Cir. 2006) (citing Russo v. City of Cincinnati, 953 F.2d 1036, 1046 (6th Cir.1992)). Defendant argues that Plaintiff has failed to present sufficient evidence from which a

28

reasonable jury could find that, because of inadequate training, the City of Circleville should be held liable for Plaintiff's injuries.  The Court agrees.

Plaintiff must first prove that the training provided was inadequate for the tasks the officers were required to perform. The Sixth Circuit has cautioned that "[m]ere allegations that an officer was improperly trained or that an injury could have been avoided with better training are insufficient to prove liability."  <u>Miller v. Calhoun County</u>, 408 F.3d 803, 816 (6th Cir. 2005) (<u>citing</u> <u>Sova v. City of Mt. Pleasant</u>, 142 F.3d 898, 904 (6th Cir. 1998)).  In this case, based on the evidence presented, no reasonable jury could find that the training provided by the City of Circleville was so deficient that it rose to the level of a constitutional violation.

Defendants note that, prior to being hired by the City of Circleville, they were fully trained on the use of force at the basic peace officer training academy. (Gaines Dep. at 25-26; Roar Dep. at 12-13; Williams Dep. at 10).  In addition, the Circleville Police Department promulgated General Order 1 which sets forth standard operating procedures governing limits of authority and use of force.  (Ex. O to Defs.' Mot. Summ. J.).  Each officer was given a copy of this order to review and was required to sign a statement that he read it.  (Roar Dep. at 14, 70-71; Williams Dep. at 11; Gaines Dep. at 28-29).  The officers were also required to review the Circleville jail manual which contains a section on "Use of Force."  (Gaines Dep. at 35).  The Circleville Police Department also had a written policy governing the provision of medical care for prisoners and trained its officers concerning such procedures.  (Gaines Dep. at 127, 129; Roar Dep. at 65; Williams Dep. at 137; Kinser Dep. at 97-99).

Plaintiff notes that the City of Circleville provided no formal training concerning the use of force and, although the officers had to sign a statement saying that they had read the policies,

they were not tested over the material.  (Gaines Dep. at 29, 33-34).  Nevertheless,  Officer

Gaines testified that after reviewing the standard operating procedures, "you then go out into the

patrol atmosphere and get trained."  (Gaines Dep. at 29).  Moreover, when he had questions

concerning proper policies and procedures, other officers were always available to provide

guidance.  (Id. at 34).  Officer Roar testified likewise.  (Roar Dep. at 71).

Plaintiff has presented no evidence that the training received was inadequate for the tasks

the officers were required to perform.  He simply speculates that additional training might have

prevented his injury.  However, as the Supreme Court noted in City of Canton:

> Neither will it suffice to prove that an injury or accident could
> have been avoided if an officer had had better or more training,
> sufficient to equip him to avoid the particular injury-causing
> conduct. Such a claim could be made about almost any encounter
> resulting in injury, yet not condemn the adequacy of the program
> to enable officers to respond properly to the usual and recurring
> situations with which they must deal. And plainly, adequately
> trained officers occasionally make mistakes; the fact that they do
> says little about the training program or the legal basis for holding
> the city liable.

489 U.S. at 391.

Even if Plaintiff could establish that the training provided was inadequate for the tasks

the officers were required to perform, there is no evidence that the City was deliberately

indifferent, or that the alleged inadequate training was closely related to or actually caused

Plaintiff's injury.

The City did make an effort to establish appropriate policies and to train its officers concerning

the use of force and the provision of medical care to pretrial detainees.  In fact, Plaintiff's expert,

Dr. Alpert, testified that "the written policies are fine."  (Alpert Dep. at 15).  Defendant notes

that the Sixth Circuit has held that where a municipality acts to prevent constitutional violations,

30

but does so negligently, there is no deliberate indifference.  <u>Molton v. City of Cleveland</u>, 839

F.2d 240, 247 (6th Cir. 1988).  In this case, the officers' deposition testimony makes it clear that

they were aware of the jail policies concerning use of force and the provision of medical care to

prisoners.  It may well be that they did not follow those policies in their interactions with

Plaintiff, but there is no evidence that additional training would have changed the outcome.

Based on the evidence presented, no reasonable jury could find that the training provided

to jail officers by the City of Circleville concerning the use of force and the provision of medical

care was so deficient as to constitute deliberate indifference to the constitutional rights of

prisoners.  Finding no genuine issue of material fact, the Court concludes that the City of

Circleville is entitled to summary judgment on Count II.

### C.    Count III (Equal Protection)

In Count III of the Third Amended Complaint, Plaintiff alleges that "due in whole or in

part to his membership in a protected class, defendants, who are Caucasian, deliberately

discriminated against Plaintiff by using excessive force against him, and/or by denying him

prompt medical treatment."  Plaintiff contends that this conduct violated his rights under the

Equal Protection Clause of the Fourteenth Amendment.  (Third Amd. Compl. ¶ 38).[7]  Defendants

claim to be entitled to summary judgment on this claim because Plaintiff has produced no

evidence that the use of force or the delay in medical treatment was motivated by a racial

animus.  The Court disagrees.

---

[7]  The Court presumes that Plaintiff's Equal Protection claim is also brought pursuant to §
1983.

Plaintiff notes that Patricia Rice, an employee of the Circleville Jail, estimated that only 2-5 % of detainees at the jail are African-American. (Rice Dep. at 50-51). The officers testified that on no previous occasion had they ever administered peroneal strikes to a handcuffed detainee, and Williams could not recall any previous instance where a handcuffed detainee was struck to obtain compliance with a verbal instruction. (Roar Dep. at 76-77; Williams Dep. at 98-99; Gaines Dep. at 134). Based on this evidence, a reasonable jury could infer that Plaintiff was treated more harshly than other detainees solely because he was African-American.

Moreover, Plaintiff testified that after he was dragged back into the cell and was lying motionless on the floor, one of the officers came into the cell and told him to get up. When Plaintiff told him he couldn't move, the officer said "Yes, you can." He then kicked Plaintiff in the ribs and said "Looks like we got us a broke nigger here." (Harris Dep. at 98). Plaintiff yelled in pain and begged the officer not to hurt him any more. The officer then turned around and left. (Id. at 99). Defendants contend that there is some question as to who that officer was. Plaintiff could not identify the officer by name, but described him as a slim white male, about 6'2", wearing black boots and a greenish jail uniform. (Id.). Defendants maintain that it could have been one of the state troopers. However, as Plaintiff notes, the jail surveillance video shows that Officer Williams is the only officer who entered Plaintiff's cell after the injury occurred. (Ex. 1 to Pl.'s Mot. Partial Summ. J.). In addition, Williams admitted that he entered the cell and attempted to roll Plaintiff over to look for a pair of missing handcuffs, and that Plaintiff cried out, "Don't hurt me." (Williams Dep. at 133-134).

In the Court's view, Plaintiff has presented sufficient evidence from which a reasonable jury could find that, because of a racial animus, Defendants engaged in an excessive use of force

32

and were deliberately indifferent to Plaintiff's serious medical needs.  Moreover, the law was
clearly established that such discriminatory conduct would be unlawful.  See Bell, 441 U.S. at
545 (holding that pretrial detainees and convicted prisoners are protected against invidious
discrimination on the basis of race).  Therefore, Defendants are not entitled to qualified
immunity, and summary judgment is not warranted on Count III.

    **D.**    **Count IV (Assault and Battery) and Count V (Intentional Infliction of
Emotional Distress)**

In Count IV of the Third Amended Complaint, Plaintiff asserts a state law claim of
assault and battery against Defendants Williams, Roar, and Gaines based on their alleged
excessive use of force.  (Third Amd. Compl. ¶¶ 41-45).  In Count V, Plaintiff asserts a claim of
intentional infliction of emotional distress based on Defendants' failure to provide medical
assistance following his spinal cord injury.  (Id. at ¶¶ 47-48).

Defendants maintain that, pursuant to Ohio Revised Code § 2744.03(A)(6), they are
statutorily immune from liability on these claims.  That statute states, in pertinent part:

> (A) In a civil action brought against . . . an employee of a political
> subdivision to recover damages for injury . . . to person or
> property allegedly caused by any act or omission in connection
> with a governmental or proprietary function, the following
> defenses or immunities may be asserted to establish nonliability:

>> (6) . . . the employee is immune from liability unless one of
>> the following applies:

>>> (a) The employee's acts or omissions were manifestly
>>> outside the scope of the employee's employment or official
>>> responsibilities;

>>> (b) The employee's acts or omissions were with malicious
>>> purpose, in bad faith, or in a wanton or reckless manner;

>>> (c) Civil liability is expressly imposed upon the employee

by a section of the Revised Code. . .

Ohio Revised Code § 2744.03(A)(6).

In other words, Defendants are immune from liability unless Plaintiff can demonstrate that their actions fall within one of the three exceptions set forth in § 2744.03(A)(6).  In connection with Count IV, the assault and battery claim, Plaintiff alleges that Defendants acted in a malicious, wanton, and/or reckless manner.  (Third Amd. Compl. ¶ 44).  This allegation implicates the exception set forth in Ohio Revised Code § 2744.03(A)(6)(b).

"'Malice' is the willful and intentional design to do injury or the intention or desire to harm another, usually seriously, through conduct that is unlawful or unjustified." Cook v. Cincinnati, 103 Ohio App.3d 80, 90, 658 N.E.2d 814, 821 (Ohio Ct. app. 1995).  "Wanton misconduct" is "[t]he failure to exercise any care toward one to whom a duty of care is owed when the failure occurs under circumstances for which the probability of harm is great and when the probability of harm is known to the tortfeasor." Brockman v. Bell, 78 Ohio App.3d 508, 515, 605 N.E.2d 445, 449 (Ohio Ct. App. 1992).  "Recklessness" is defined as "a perverse disregard of a known risk." Poe v. Hamilton, 56 Ohio App. 3d 137, 138, 565 N.E.2d 887, 889 (Ohio Ct. App. 1990).

The question of whether an officer acted with malice, or in a wanton or reckless manner is normally a question of fact that must be determined by a jury.  See Wingrove v. Forshey, 230 F. Supp. 2d 808, 827 (S.D. Ohio 2002) (citing Fabrey v. McDonald Village Police Dept., 70 Ohio St. 3d 351, 639 N.E.2d 31, 35 (1994), and Potter v. Troy, 78 Ohio App. 3d 372, 604 N.E.2d 828, 837-38 (1992)).  In this case, Plaintiff has raised a genuine issue of material fact about whether the exception to statutory immunity set forth in Ohio Revised Code § 2744.03(A)(6)(b)

34

applies to the three incidents alleging excessive force.  Viewing the evidence in a light most favorable to Plaintiff, a reasonable jury could find that Defendants acted with a malicious purpose, or in a wanton or reckless manner.  This is particularly true with respect to Plaintiff's claim that when he was first taken in handcuffs to the cell, the officers kicked his leg out from under him and pushed him in the back, causing him to fall and land on his head, and with respect to Plaintiff's claim that Officer Williams came back into the cell and kicked him in the ribs. Such conduct, if proven, clearly rises above the level of negligence and could be viewed as malicious, wanton or reckless.

Whether Plaintiff has presented sufficient evidence from which a reasonable jury could find that Defendants acted with malice, or in a wanton or reckless manner during the takedown maneuver in the booking area is a much closer call.  Defendants note that Plaintiff's own experts testified that there was no indication that the officers acted with the intent to injure Plaintiff. While a lack of intent to cause injury may foreclose a finding of malice, it does not foreclose a finding that the officers acted in a wanton or reckless manner.  See Tighe v. Diamond, 149 Ohio St. 520, 526 (Ohio 1948).

Defendants contend that they exercised due care during the takedown maneuver, making sure to cushion Plaintiff's fall.  Plaintiff argues, however, that the act of administering painful peroneal strikes, which Dr. Alpert has concluded were unnecessary, demonstrates wanton or reckless misconduct.  Based on the evidence presented, and particularly on the testimony of Plaintiff's expert witnesses, the Court believes that a reasonable jury could find that Defendants acted in a wanton or reckless manner by administering peroneal strikes to a handcuffed detainee during the takedown maneuver.  For these reasons, the Court denies Defendants' motion for

35

summary judgment on Count IV.

With respect to Count V, the intentional infliction of emotional distress claim, Plaintiff does not allege that Defendants acted with a malicious purpose, in bad faith, or in a wanton or reckless manner.  Nor does Plaintiff allege that Defendants' acts or omissions were manifestly outside the scope of their employment, or that civil liability is otherwise expressly imposed upon them by statute.  Because none of the exceptions set forth in Ohio Revised Code § 2744.03(A)(6) applies, the Court finds that Defendants are statutorily immune from liability on Plaintiff's claim of intentional infliction of emotional distress.  They are, therefore, entitled to summary judgment on Count V.

## IV.    Conclusion

For the reasons stated above, Plaintiff's motion for partial summary judgment on his § 1983 claim of deliberate indifference to serious medical needs (Record at 96) is **DENIED**. Defendants' motion for summary judgment (Record at 97) is **GRANTED IN PART and DENIED IN PART**.  Genuine issues of material fact preclude summary judgment on Counts I, III, and IV of Plaintiff's Third Amended Complaint.  However, the Court grants summary judgment in favor of the City of Circleville on Count II, and in favor of Defendants Roar, Phillips, and Gaines on Count V.

**IT IS SO ORDERED.**

Date: January 23, 2008                          **/s/ John D. Holschuh**
                                                John D. Holschuh, Judge
                                                United States District Court

36
